Steven RUSS, Petitioner,

v.

Thomas ISRAEL, Respondent.

No. 81–C–257.

United States District Court,
E. D. Wisconsin.

Jan. 28, 1982.

Harvey Jay Goldstein, Goldstein & Goldstein, Milwaukee, Wis., for petitioner.

Bronson F. LaFollette, Wis. Atty. Gen. by Michael R. Klos, Asst. Atty. Gen., Madison, Wis., for respondent.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

Steven Russ petitions for a writ of habeas corpus. His petition originally contained ten grounds, but grounds numbered five and ten were dismissed for failure to exhaust state remedies in an order dated May 28, 1981. In addition, I granted Mr. Russ' motion to amend his petition to include a ground numbered eleven in an order dated July 2, 1981. In his brief in support of his petition, Mr. Russ has concentrated on grounds numbered two, eight, and eleven. Accordingly, I will address those grounds first.

### I. BACKGROUND

Mr. Russ was convicted after a jury trial in circuit court for Milwaukee County of armed robbery, party to a crime, in violation of Wis.Stat. §§ 943.32(1)(b), (2) and 939.05. Judgment of conviction was entered on September 8, 1978. Judge Christ T. Seraphim presided at the trial. The following factual background is derived from the transcript of Mr. Russ' trial and includes matters that are not disputed.

In the early morning of April 19, 1976, two men armed with sawed-off shotguns entered a restaurant in Milwaukee. One of the men ordered the counter attendant, Sharon Herriges, to empty the cash register; the other covered the patrons in the restaurant. The cash drawer was taken by the man covering Ms. Herriges. She testified that the register contained about $200, including $40 in change. The manager of the restaurant, Solon Wiggins, was present, as was a customer, Bruce Holland. After taking the money, the men fled, and Mr. Wiggins called the police. Later that day, a sawed-off shotgun was found in the yard of a home a short distance from the restaurant in the direction the men had fled.

Approximately one and a half hours after the robbery, a police officer observed Mr. Russ and Alphonso Rhoden driving a car within nine blocks of the restaurant. He stopped them for a minor traffic violation. When he searched Mr. Rhoden, he discovered two shotgun shells in Mr. Rhoden's coat; one shell was identical to a shell found in the abandoned shotgun, the other was similar. Messrs. Rhoden and Russ also matched the police radio description of the restaurant robbers. The officer took them back to the restaurant, where they were positively identified as the robbers by Ms. Herriges and Mr. Wiggins. Their car was eventually searched, and clothing similar to that worn by the robbers was discovered. A jacket found in the car contained a substantial amount of change. The police also found a sawed-off shotgun in the trunk.

A preliminary hearing was held eight days after the robbery. Mr. Wiggins was the only witness called, and he again identified Messrs. Russ and Rhoden as the robbers. Mr. Holland also attended the preliminary hearing and told the police that the two were the robbers.

For a variety of reasons, the trial was delayed for a substantial period of time, and Mr. Wiggins died in the interim. Over defense objections, the transcript of his testimony at the preliminary hearing was read to the jury. Mr. Holland and Ms. Herriges also testified, but neither was sure that Messrs. Russ and Rhoden were the robbers. The two were convicted. Mr. Rhoden received a seventeen year sentence; Mr. Russ was sentenced to twenty-five years, to be served consecutively to two eight year concurrent sentences imposed in 1977 after convictions for armed robbery. Mr. Russ is currently confined in the Wisconsin correctional institution at Waupun.

## II. GROUND TWO

■ In ground two of his petition, Mr. Russ asserts that Judge Seraphim ejected him from the courtroom and that this violated his constitutional rights under the fifth, sixth and fourteenth amendments. It is well-settled that a criminal defendant has

the right to represent himself at trial. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). A criminal defendant also has the right under the sixth amendment to be present in the courtroom during his trial. *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970). However, a defendant may lose that right if he

"... insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom. Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." *Id.*, at 343, 90 S.Ct., at 1060 (footnote omitted).

The Supreme Court in *Allen* made explicit reference to its earlier admonition in *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), that a trial judge must exercise every reasonable presumption against the loss of constitutional rights, *Allen, supra*, 397 U.S. at 343, 90 S.Ct. at 1060, but endorsed removal as one of at least three "constitutionally permissible ways for a trial judge to handle an obstreperous defendant." *Id.*, at 343–44, 90 S.Ct., at 1060–1061.

When the petitioner's trial commenced, he complained that his court-appointed counsel, Jack Goldberg, was unprepared for trial. After considerable discussion, it was agreed that Mr. Russ would represent himself, but that Mr. Goldberg would remain in the courtroom for possible assistance. Tr., J–I, pp. 2–19. (The trial transcript has two parts, both labeled "J." Counsel have adopted the nomenclature "J–I" and "J–II," and I will also do so). Mr. Russ then acted as his own attorney on a variety of pretrial matters, although he consulted with Mr. Goldberg on occasion. J–I, pp. 38, 79.

The period when Mr. Russ represented himself was often marred by difficulties. Mr. Russ made improper statements or raised improper questions several times. *See* J–I, pp. 25, 35, 39–40, 43, 55, 57–58, 65,

106, 213. His representation of himself was also peppered with vulgar remarks. *See* J–I, pp. 41, 46, 49, 80–81, 98, 106. He frequently disrupted the orderly process of the court. *See* J–I, pp. 43–44, 46–47, 48–49, 61–62, 77, 94–98. The trial judge repeatedly warned Mr. Russ that his conduct would prompt his gagging or removal from the courtroom. J–I, pp. 40–41, 44, 47–49, 61, 77, 82, 95, 97–98, 100–02, 106–07, 191–92.

Mr. Russ' conduct is perhaps best illustrated by the following passage:

"THE COURT: [Addressing the jury]

\* \* \* \* \* \*

"They both may be innocent. Maybe only one is guilty. Maybe both are guilty. It is going to be up to you to decide in the end.

"DEFENDANT RUSS: Why don't you quit talking that jive. You are trying to railroad me. How did my case end up from Wedemeyer court to this Court. You explain that other jive to me. Explain that to him. Explain how you people initially and arbitrarily sent my case to Wedemeyer's courtroom to your courtroom.

"THE COURT: Mr. Russ—

"DEFENDANT RUSS: You are trying to railroad me.

"THE COURT: Mr. Russ, are you going to remain silent? Are you going to remain silent as you promised me you would?

"DEFENDANT RUSS: What you mean I promised? I don't come with all that ethical bullshit. You're the worst shit. You know enough to hang a judge. Why—

"THE COURT: Bring the defendant into my Chambers. Madam Reporter?

"(The following proceedings were held in Chambers out of the presence of the prospective jurors.)

"[The prosecutor]: I'd like—

"DEFENDANT RUSS: Mother-fucker, conspiring against me, man.

"[The prosecutor]: I have been involved with this man for over a year and a half, and I've been down the road with

him through five attorneys, and I've seen these allegations. I've seen these explosions. I've tried him in front of Judge Wedemeyer when he had an attorney giving him advice, and he tried the case.

"THE COURT: was there a mistrial on that?

\* \* \* \* \* \*

"[The prosecutor]: A different matter. My point is that this is not new conduct. It is my view that this has been calculated conduct to avoid going to trial, that this is just another effort to—

"DEFENDANT RUSS: Why don't you quit that?

"[The prosecutor]: He has fired attorneys—

"DEFENDANT RUSS: You wouldn't buy your own law books rules and regulations.

"[The prosecutor]" He has fired attorneys—

"THE COURT: Will you remain—

"DEFENDANT RUSS: The man—

"THE COURT: Bring a gag. Bring a gag.

"DEFENDANT RUSS: You ain't said nothing.

"THE COURT: Will you remain silent?

"DEFENDANT RUSS: You going to put—

"THE COURT: Shackle him.

"DEFENDANT RUSS: —before this girl, that woman, sawed off shotguns and tell her to identify me, buying her identify me—

"THE COURT: He's threatening the police officer.

"DEFENDANT RUSS: All I said, I'm coming out, man. I don't care what you talking about. You don't have to gag me. There ain't going to be no more outbursts.

"THE COURT: I—are you telling me now that you will stop talking when I tell you to stop?

"DEFENDANT RUSS: Right.

"THE COURT: And you are not going to make another outburst?

"DEFENDANT RUSS: Right.

"THE COURT: All right. Let's go out there. This is the last chance I will give him.

"AN OFFICER: The handcuffs off?

"THE COURT: He has now given me his word. We will see what good his word is. Wait a minute. Do you give me your word as a Muslim that you will not make another outburst?

"DEFENDANT RUSS: I'd be a fool to even say something like that to you.

"THE COURT: That's an oath. On your oath as a Member of your Church?

"DEFENDANT RUSS: I wouldn't make an oath to you. I would never make an oath to you, man, couldn't make an oath to you. I'd kill myself first.

"THE COURT: Oh, then you are not sincere. Are you telling me that, sir, you don't really—

"DEFENDANT RUSS: I'm saying that I would never make an oath to you, like I couldn't do it.

"THE COURT: You mean to me personally or to any other man?

"DEFENDANT RUSS: To you.

"THE COURT: Why?

"DEFENDANT RUSS: Because, man, you prove yourself to be the most horrendous assed, mother-fucking ass, filthy ass, low-lying, unethical judge that existed.

"THE COURT: Well, thank you for the compliment.

"DEFENDANT RUSS: You are a racist, too.

"THE COURT: Are you going to have another outburst?

"DEFENDANT RUSS: I told you weren't going to be no more outburst.

"THE COURT: What? Okay. Let's try it. We will try it once more." J–I, pp. 45–49.

Mr. Russ' conduct did not improve and twice culminated in his removal from the courtroom. The first time he was removed the jury was not present. The court was hearing various defense motions when Mr. Russ interrupted the judge's ruling on Mr. Rhoden's motion for severance. J–I, pp. 105–06. The following transpired:

"DEFENDANT RUSS: Are you trying to suggest to the witness there was never any time during this case—

"THE COURT: Mr. Russ, I am talking.

"DEFENDANT RUSS: Miss Herriges ever said anything about this defendant robbing her.

"THE COURT: I am not talking about—

"DEFENDANT RUSS: That's—you suggesting that. You are suggesting that. You are trying to intimidate this witness. You are trying to instruct this witness the same way [the prosecutor] did inside his office when he laid two sawed-off shotguns before her feet and he said, 'Did he rob you?' She said no. He say, 'Did he rob you?' She is crying—

"THE COURT: Sir—

"DEFENDANT RUSS: Miss Herriges, did this individual—

"THE COURT: Are you going to stop, Mr. Russ?

"DEFENDANT RUSS: Well, man, why don't you freeze that jive?

"THE COURT: I am not talking about that young lady. I am talking about the deceased witness."

"DEFENDANT RUSS: Young lady—

"THE COURT: All right. I've had it. Get him out of here. This is it.

"DEFENDANT RUSS: Racist ass.

\* \* \* \* \* \*

"THE COURT: He is out of the courtroom for good until he decides he wants to come back here, but he'll be bound and gagged if he does." J–I, pp. 106–07.

After Mr. Russ' removal from the courtroom, the court heard lengthy arguments on several defense motions. J–I, pp. 106–202. Mr. Goldberg acted on Mr. Russ' behalf on the motions and on occasion conferred with him. J–I, p. 187. During this time Mr. Russ was in a room with a speaker system that conveyed the proceedings to him. J–I, pp. 190–91, 196. Despite his absence from the courtroom, he was able to create noise loud enough to disrupt the proceedings. J–I, p. 121. Nevertheless, Mr. Russ was permitted to return for the open-

ing statements, J–I, p. 203, and he remained unshackled and without a gag throughout the testimony. He did not represent himself, however; he gave permission for Mr. Goldberg to examine the witnesses. J–I, p. 231.

Mr. Russ remained in the courtroom until the closing arguments. The trial judge agreed to allow Mr. Russ to give the closing arguments if it was a prepared statement, but the statement Mr. Russ had was not satisfactory to the judge. J–II, pp. 171–72. Mr. Russ then asked for a ruling on an issue; the ruling was made, but Mr. Russ was unsatisfied and interrupted the judge's efforts to proceed with the closings. J–II, pp. 175–76. At this point, Mr. Russ was removed from the courtroom in the presence of the jury. J–II, p. 176. The judge cautioned the jury that they were to decide the case on the evidence, not on the courtroom spectacle. *Id.* Similar instructions had been given previously, J–I, p. 45, and the issue had been raised during the voir dire. J–I, pp. 58–60. Mr. Russ was not present during the closing arguments.

■ Considering the record as a whole, I am persuaded that the removal of Mr. Russ did not violate his constitutional rights. Mr. Russ had repeatedly disrupted the court's proceedings; his intent to do just that is evidenced by a letter he sent to his co-defendant prior to trial, which read in part:

"I think it would be in your interest to instruct your attorney to motion for severance. Our interests just aren't the same. While you are interested only in obtaining your freedom, my greatest interest is in jamming the bitch, even at the risk of incurring 25 more years. I will be charging a malicious prosecution. I will be calling to the stand representatives from the Justice Department and the FBI. It will be my argument that I am the victim of a conspiracy." Response to petition, exh. G, filed May 14, 1981, pp. 15–16.

I am satisfied that Mr. Russ' conduct at trial justified his removal on both occasions. The events just prior to the removals cannot be viewed in isolation. Mr. Russ' conduct prior to the taking of testimony was highly disruptive and hardly conducive to an orderly trial. I believe that Mr. Russ' conduct is precisely the type of behavior that justifies removal under *Allen.* In addition, Mr. Russ was only absent during argument on motions and the closing arguments; he was present for all testimony to the jury. Accordingly, I find no basis for his assertion that his rights to confront witnesses and to due process were infringed. I also find no merit to the contention that he was deprived of his right to represent himself at trial. His own abysmal behavior forfeited that right. The petition cannot issue on this ground.

### III. GROUND EIGHT

■ Ground eight of the petition asserts that the comments of a juror so prejudiced the panel that a mistrial should have been declared. The petitioner asserts that because these matters were not transcribed, the court should conduct an evidentiary hearing pursuant to *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Mr. Russ argues that the juror stated "that she could not serve impartially because she had 'seen those guys (the petitioner and his co defendant) around the neighborhood.'" He further contends that the judge "chastised" her for that position, but eventually excused her. The judge also "dissuaded" any other jurors from being excused by "employing oppressive and forebearing posture." (All quotations are from ground eight of the petition, filed May 17, 1981.)

I am unable to discern any basis for an evidentiary hearing. The petitioner fails to establish any prejudice from the events described above, and I do not believe any prejudice is present. The judge's conduct is similar to that of any judge faced with jurors who are reluctant to devote a portion of their time to jury duty. I find that ground eight will not support the issuance of the writ.

### GROUND ELEVEN

■ In ground eleven, the petitioner asserts that the trial court erred in admitting into evidence the transcript of the preliminary testimony of Mr. Wiggins, who was deceased at the time of trial. The testimony was admitted pursuant to Wis. Stat., § 908.045(1), an exception to the hearsay rule. The confrontation clause of the sixth amendment requires a showing that the witness whose testimony is offered is unavailable and that the testimony bears "adequate 'indicia of reliability.'" *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Preliminary hearing testimony can be admissible at trial if it was "given under circumstances closely approximating those that surround the typical trial." *California v. Green*, 399 U.S. 149, 165, 90 S.Ct. 1930, 1938, 26 L.Ed.2d 489 (1970). Such circumstances include the witness being under oath, the defendant being represented by counsel, the proceedings conducted before a judicial tribunal with the ability to keep an appropriate record, and the defendant given the opportunity to cross-examine the witness. *Id.* Mr. Russ does not dispute that the first three circumstances were present at his preliminary hearing, but he argues that his opportunity to cross-examine Mr. Wiggins was unduly restricted.

■ Mr. Wiggins' testimony primarily involved his identification of Messrs. Rhoden and Russ as the robbers of his restaurant. On direct testimony, he positively identified Mr. Russ as one of the robbers. Tr., preliminary hearing held on April 17, 1976, pp. 6–7. His entire testimony on direct examination comprises approximately seven pages. *Id.*, at 6–10. Conversely, the cross-examination by the two defense attorneys comprises approximately twenty-two pages. *Id.*, at 10–32. The cross-examination extensively explored the events surrounding Mr. Wiggins' viewing of Messrs. Russ and Rhoden outside the restaurant. *Id.*, 10–17, 31–32. Mr. Wiggins was also questioned at length about his opportunity to view the robbers at the time of the robbery, the events of the robbery, and the physical characteristics of the robbers. *Id.*, pp. 19–30.

Several objections to defense questions were sustained at the hearing. *Id.*, at 12, 13, 15, 16, 18, 20, 31, and 32. Many of the questions that were not permitted did not relate to the identification in any manner. Other forbidden questions were directed to the police procedures used at the identification outside the restaurant. Despite the judge's rulings, persistent defense questioning produced answers to what the police said to Mr. Wiggins prior to the identification. *Id.*, at 16, 32.

The petitioner argues that the restrictions on the cross-examination prevented exploration of the credibility of Mr. Wiggins, "a crucial trial issue." Thus Mr. Russ argues that the cross-examination was unduly restricted. However, the restrictions on the cross-examination at Mr. Russ' preliminary hearing were significantly less than the restrictions found in *United States ex rel. Haywood v. Wolff*, 490 F.Supp. 1154, 1156 (N.D.Ill.1980). In that case, the court of appeals reversed the granting of a habeas corpus petition based on this issue. The court held that

"... the mere fact that [the witness'] preliminary hearing testimony was not subjected to as an intensive cross-examination as it could have been at trial does not render it inherently unreliable." 658 F.2d 455, 462 (7th Cir. 1981).

The court of appeals then stated:

"The test for determining whether preliminary hearing testimony is admissible under the Confrontation Clause ... is ... whether there are adequate indicia of reliability to justify its placement before the jury, even though there is no contemporaneous confrontation of the declarant." *Id.*, at 463.

I am satisfied that the testimony of Mr. Wiggins meets this test. It was given in open court, under circumstances that would impress upon him the importance of it. The permitted cross-examination was sufficient to permit the defense "to determine precisely what [the witness] claimed to know and the claimed basis for his knowl-

edge." *Id.* Mr. Wiggins' testimony was corroborated in many significant details by Ms. Herriges, Mr. Holland, and others. I find no violation of Mr. Russ' right to confrontation in this record.

## V. OTHER GROUNDS

The petitioner contends in ground one of the petition that the court's "oppressive and antagonistic behavior towards the petitioner and the cumulative effect of it's [sic] comments precluded a fair and impartial trial." I have reviewed the full transcript of the petitioner's trial, and I find no violations of the petitioner's constitutional rights by the judge's behavior. As discussed above, Mr. Russ was highly disruptive at his trial, and I believe that the judge acted reasonably under the circumstances.

█ In ground three, the petitioner contends that his trial counsel was ineffective because he was unprepared and his counsel on appeal was ineffective because she refused to raise the issue of the trial judge's conduct. As to the former charge, I find no basis in the record for any allegation that petitioner's trial counsel was ineffective. The representation Mr. Russ received easily surpassed the "minimum professional standard." *See United States ex rel. Williams v. Twomey*, 510 F.2d 634, 640 (7th Cir.), *cert. denied*, 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975). As for the counsel on the appeal, I agree with the respondent that this contention is moot because Mr. Russ submitted the issue of the alleged impropriety to the Wisconsin supreme court in a pro se petition, and the court considered that issue on its merits. *See State v. Russ*, 97 Wis.2d 761, 300 N.W.2d 77 (1980).

█ In ground four, Mr. Russ contends that he was denied a fair trial because the trial judge was personally acquainted with a witness. Putting aside the question of whether this assertion would be sufficient to state a constitutional violation, I find no support for the alleged relationship in the record. The trial judge did refer to the witness by her first name twice, J–I, pp. 98, 232, but there is no indication in the record that the judge had even met the witness prior to the trial. In fact, the judge was irritated with the witness because she had not appeared as scheduled, and he eventually sentenced her for that offense. J–II, p. 233.

Ground six of the petition asserts that the court did not permit Mr. Russ to explore the possible prejudices of the jury panel during voir dire. The contention is without merit. The judge raised this issue on voir dire. J–I, p. 76.

█ In ground seven, Mr. Russ asserts that he was denied a fair trial because his case was transferred to Judge Seraphim from another court. In Wisconsin, a defendant is permitted one substitution of judges without any showing of prejudice, Wis.Stat. § 971.20, but Mr. Russ had already used that right. J–I, pp. 89–90. The petitioner has not established that any prejudice resulted from the transfer to Judge Seraphim, and therefore this ground does not establish any constitutional issue.

█ In ground nine of the petition, Mr. Russ contends that the first identification of him by Mr. Wiggins, outside the restaurant, was "tainted with suggestibility." This issue was extensively explored in a suppression hearing at trial. J–I, pp. 145–184. Messrs. Russ and Rhoden were returned to the restaurant about one and a half hours after the robbery. They were dressed in the clothes they had on at the time of their arrest, and they were not handcuffed. They were shown to Ms. Herriges and Mr. Wiggins individually. Both witnesses made positive identifications.

In *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the Supreme Court stated:

> The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it...." *Id.*, at 302, 87 S.Ct., at 1972 (footnote omitted).

In *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the Court again considered the use of "showups" and stated that

"... the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.' ... It is the likelihood of misidentification which violates a defendant's right to due process.... But as *Stovall* makes clear, the admission of evidence of a showup without more does not violate due process." *Id.*, at 198, 93 S.Ct., at 381, quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

*Biggers* then listed several "factors to be considered in evaluating the likelihood of misidentification." *Id.*, at 199, 93 S.Ct., at 382.

Examination of the *Biggers* factors leads me to conclude that the likelihood of misidentification was minimal at the showup outside the restaurant. Both Mr. Wiggins and Ms. Herriges had ample opportunity to view the robbers inside the restaurant. Both had their attention fixed on the intruders, and their previous descriptions of the robbers accurately described Messrs. Rhoden and Russ. Both identifications were firm; Mr. Wiggins was especially certain that the police had the right men. Finally, only a brief period had passed from the time of the robbery to the time of the showup. I am satisfied that Mr. Wiggins' identification of Mr. Russ was reliable under the circumstances.

## CONCLUSION

In summary, I find that Mr. Russ' removal from the courtroom did not violate his rights under the fifth and sixth amendments. I also find that the petitioner has not made a showing sufficient to justify a hearing on the issue of the juror's comments, and I conclude that no prejudice could have resulted from those comments. I further find no error in the admission of the preliminary hearing testimony of the deceased witness. None of the other grounds in the petition will support issuance of the writ.

Therefore, IT IS ORDERED that the petition of Steven Russ for a writ of habeas corpus be and hereby is denied.

IT IS ALSO ORDERED that this action be and hereby is dismissed.